**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :   CRIMINAL NO. 19-64-2 |
| | : |
| JOHN DOUGHERTY and | |
| ROBERT HENON | |

## <u>ORDER</u>

**AND NOW**, this_____day of_____, 2021, upon

consideration of Defendant, Robert Henon's, Motion for Judgment of Acquittal, **IT IS**

**HEREBY ORDERED** that Defendant's Motion is **GRANTED** and a judgment of acquittal is

entered in favor of Defendant on all Counts.

BY THE COURT:

_____
Schmehl, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO. 19-64-2 |
| v. | : | |
| | | |
| JOHN DOUGHERTY and | | |
| ROBERT HENON | | |
| | : | |
| | : | |

**MOTION OF DEFENDANT ROBERT HENON
FOR JUDGMENT OF ACQUITTAL**

Defendant, Robert Henon, by and through his undersigned counsel, hereby moves

for judgment of acquittal pursuant to Fed. R. Crim. P. 29. In support of this motion, Mr.Henon

relies upon the accompanying memorandum of law.

Date: November 26, 2021

Respectfully submitted,

/s/ Brian J. McMonagle
Brian J. McMonagle, Esq.
McMonagle Perri McHugh
1845 Walnut St.
Philadelphia, Pa 19103
bmcmonagle@mpmpc.com
*Counsel for Defendant Robert Henon*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 2:19-cr-0064 |
| v. | : | |
| | : | : |
| JOHN DOUGHERTY and | : | |
| ROBERT HENON | : | |
| | : | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF ROBERT HENON'S<br>MOTION OF  FOR JUDGMENT OF ACQUITTAL</u>

### THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICENT TO SUSTAIN A CONVICTION ON ANY OF THE COUNTS OF CONVICTION

This case involves the **unprecedented bribery prosecution** of an elected official which is based on a **stream of benefits** to which the elected official was **legally entitled** and which he was **receiving prior** to holding office.   Robert Henon is an outstanding councilperson, who has spent the last decade working on behalf of the homeless, police officers, firefighters, nurses, children, and the disenfranchised. He has committed no crimes and his conviction is a travesty of justice. Once again, the Government has relied on the vagueness of the Honest Services Fraud statute to criminalize politics.

Rule 29 of the Federal Rules of Criminal Procedure provides that a defendant may move for a judgement of acquittal after a jury's verdict.  In ruling on a motion pursuant to Rule 29, a district court "must determine whether any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence presented at trial." *United States v. Smith,* 294 F.3d 473, 478 (3d Cir. 2002).

I.   **THE GOVERNMENT FAILED TO PROVE THE *QUID PRO QUO* REQUIRED UNDER THE HONEST SERVICES FRAUD STATUTE AND A JUDGEMENT OF ACQUITTAL MUST BE GRANTED AS TO COUNTS 1, AND 4-10.**

For decades, federal prosecutors zealously prosecuted public sector honest services fraud with impunity. In his dissent in *Sorich v. United States,* 555 U.S. 1204, 129 S.Ct. 1308, (2009), Justice Scalia issued the following warning:

> If the "honest services" theory … is taken seriously and carried to its logical conclusion, presumably the statute also renders criminal a state legislators decision to vote for a bill because he expects it will curry favor with a small minority essential to his reelection [and] a mayor's attempt to use the prestige of his office to obtain a restaurant table without a reservation…indeed it would seemingly cover a salaried employee's phoning in sick to attend a ball game. In many cases, the maximum penalty for violating this statute will be added to the maximum penalty for violating 18 U.S.C. § 666.

A year later, in *Skilling v. United States,* 561 U.S. 358, 130 S.Ct. 2896, 177 (2010), the Supreme Court substantially narrowed the reach of the "honest services fraud" statute, 18 U.S.C. § 1346, by holding that it applies only to "bribery and kickback schemes", not to "undisclosed self-dealing or a conflict of interest by a public official or private employee." "[F]or bribery, there must be a *quid pro quo* – a specific intent to give or receive something of value in return for an official act." *United States v. Sun-Diamond Growers of California,* 562 U.S. 398, 404-405 (1999). *Quid pro quo* is Latin and means "this for that" or "these for those". In order to establish *quid pro quo,* the Government must prove that "the payor provided a benefit to a public official intending that he will thereby take favorable acts that he would not otherwise take," and that "the public official accepted those benefits intending to take official actions in return for the benefits. *United States v. McDonnell,* 136 S.Ct. 2355, 2371 (2016), and *see United States v. Wright,* 665 F.3d 560, 568 (3d. Cir. 2012).

As they had in done in *Skilling,* the Supreme Court in *McDonnell* ruled against the government, and condemned the government's overzealous and overbroad interpretation of the Honest Services Fraud statute.  In *McDonnell*, the Supreme Court recognized that the **relevant point in time in a *quid pro quo* bribery scheme is the moment at which the public official accepts the payment.** *See id.* At 2374; *see also Evans v. United States,* 504 U.S. 255, 112 S.Ct. 1881 (1992). "[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts…)". *Id.* at 2374.  *McDonnell* makes it clear that, at the time the bribe is made, the promised official act must relate to a "properly defined" "question, matter, cause, suit, proceeding or controversy." *See McDonnell,* 136 S.Ct. at 2374. For bribery to be proven, there must be a **specific intent** that the public official received something of value in exchange for an official act, and that the official had an intent to be influenced in an official act. *United States v. Bryant,* 556 F. Supp. 2d 378, 391 (D.N.J. 2008).

Not every payment made to a public official constitutes a bribe. *Id.* As the Court recognized in *United States v. Silver,* 948 F.3d 538, 558 (2d Cir. 2020), without the essential requirement that an official accept with the specific intent to perform in return, any public official could be vulnerable to criminal prosecution. "The relevant point in time in a *quid pro quo* bribery scheme is the moment at which the public official accepts the benefit." *United States v. Menendez,* 291 F.Supp. 3d 606, 620 (D.N.J. 2018). In order to satisfy the *quid pro quo* requirement the official must accept the benefit or stream of benefits **to which he is not legally entitled to** in return for promise to do something about a question or matter that "may be understood to refer to a formal exercise of governmental power." *McDonnell,* at 2639. "Absent a promise, there is no *quid pro quo.*" *Silver,* at 558.

### A. ROBERT HENON WAS PERMITTED BY THE PHILADELPHIA CITY CHARTER TO RECEIVE HIS LOCAL 98 SALARY AND BENEFITS WHILE SERVING ON CITY COUNCIL AND AS SUCH THE GOVERNMENT HAS FAILED TO PROVE THAT HE RECEIVED A STREAM OF BENEFITS TO WHICH HE WAS NOT LEGALLY ENTITLED

The defendant was convicted of Conspiracy to Commit Honest Services Fraud in Counts 1, and 4-10 which charged Honest Services Wire Fraud.  The indictment alleges that in 2015 and 2016 John Dougherty provided Robert Henon with a stream of personal benefits, to which he was not entitled to, including a salary from Local 98 and tickets to sporting events, and that Mr. Henon accepted the stream of benefits in exchange for Mr. Henon's promise to take various official actions on behalf of John Dougherty.   The evidence introduced during the trial proved otherwise.

The evidence presented at trial established that Mr. Henon had been a paid employee of Local 98 since 1989, making as much as $154,812 in annual salary, in addition to his benefits and various perks of his employment, such as a company vehicle and tickets to sporting events. (N.T. 11-4-21, p. 98).   In 2011, he decided to run for Philadelphia City Council and was elected. At that time, Local 98 decided to continue Mr. Henon's employment, benefits and use of sporting event tickets, but reduced his actual salary to $73,705 and took away his company vehicle. In Pennsylvania, elected officials such as members of Philadelphia City Council are legally entitled to maintain outside employment so long as they report said employment.  The government's own evidence confirmed that Mr. Henon dutifully reported his outside employment every year as required.  There was absolutely no evidence presented that Local 98 or John Dougherty separately bribed Mr. Henon in 2012 or in any year thereafter. Moreover, there was no evidence presented

that Mr. Henon accepted his reduced salary and benefits from 2011- present in return for a

promise or agreement by him that he would engage in official acts or otherwise exercise

governmental power on behalf of Local 98. To the contrary, numerous witnesses testified and

confirmed that Mr. Henon  performed valuable work for Local 98 from 2012- present, separate

and apart from his role on City Council.

      In four weeks of testimony, much of which was the presentation of intercepted calls

between Mr. Henon and Mr. Dougherty, there was no evidence presented that in 2015 or 2016,

Mr. Dougherty and Mr. Henon entered into a corrupt agreement. Recognizing that no such

evidence existed, the Government spent four weeks proving that Mr. Henon performed some acts

at the request of Dougherty in an attempt to persuade the jury that since the acts were performed

there must have been a *quid pro quo*.  It is true that a *quid pro quo* need not be explicit or

express, and may be established by circumstantial evidence. *Wright,* 665 F.3d at 568. Certainly,

the Government may prove the *quid pro quo* circumstantially by showing that an

elected official started receiving a salary or other benefits **he or she was not entitled to** after

being elected to office, and thereafter engages in official acts on behalf of the provider.  *See*

*United States v. Bryant,* 556 F. Supp 2d. 378 (D. N.J. 2008). In some cases, the government will

present cooperating witnesses or tapes which detail the nature of the corrupt agreement that was

entered into.  Here the government offered no evidence that Mr. Henon and Mr. Dougherty

entered into a corrupt agreement when Mr. Henon started receiving his salary and benefits as a

city councilperson.  To the contrary, the evidence clearly established that Mr. Henon was already a

salaried employee of Local 98 prior to his election in 2011, and continued in that employment

from 2012 – present. This is the only case we have ever seen in which the Government indicted a

public official who was already receiving benefits and salary prior to entering office, who

thereafter disclosed the benefits after being elected, and is thereafter charged with bribery.

      It is beyond cavil that the government must prove beyond a reasonable doubt that at the

time of the receipt of the payment or bribe, Mr. Henon took the payment with the specific intent to

perform an official act in return. Not only did the government fail to present any evidence that Mr.

Henon believed that his continued salary and benefits were a bribe, the government concedes that

they have no evidence of when the so called corrupt agreement occured. On November 1, 2021,

AUSA Frank Costello conceded during the Rule 29 argument that the government has no idea

when the agreement began:

> (Judge Schmel) So, Mr. Costello are you suggesting that the agreement began in January
> 2012.
>
> (Mr.  Costello) No, your honor. We are not suggesting anything, **nobody knows.** In other
> words, nobody knows whether it did or it didn't… ( N.T. 11-1-21, p. 57)

This damning concession underscores the fatal flaw of this prosecution. Robert Henon was

**legally entitled** under Philadelphia's City Charter to continue to receive his salary and benefits

from Local 98 while serving on City Council. Therefore, the government must be required to offer

direct evidence that he accepted the salary by providing a promise to perform official acts on

behalf of the union in return for said benefits. No evidence was presented that Mr. Henon accepted

his salary and benefits in 2012, or any other year, in return for the promise to perform official acts.

Instead, the government argues that by proving that Henon acted in conformity with the advice

and recommendations of Dougherty while receiving a salary and benefits from Local 98, they

have proven that the salary to which he was lawfully entitled to was a bribe.  As this Court

recognized in its Opinion of November 22, 2021:

>  What complicates this case is that the City of Philadelphia has determined that
> Philadelphia City Councilmembers may retain outside employment in addition to
> their City salary and benefits.  Thus, Councilmember Henon's salary and benefits are
> legal under the Philadelphia City Charter. However, as per the Government's allegations,
> Councilmember Henon's Local 98 salary and benefits turn into an illegal stream of
> benefits when Henon communicates with his Local 98 boss, John Dougherty, and then
> acts in relation to the communication with a corrupt intent. Under the Federal
> Government's prosecution which I have held was properly brought under the law, every
> Philadelphia City Councilmember or any public official in the United States, who retains
> a salary from an outside employer, communicates with that employer, and then acts or
> agrees to act in relation to that communication are then susceptible to an honest services
> prosecution with the only element of a "corrupt intent" separating them from conviction."
> ( 11-22-21, Opinion of the Court).

In *Skilling,* the Court declined to find § 1346 facially unconstitutional, holding that it was not impermissibly vague if construed to reach only straightforward bribery and kickback schemes, and not undisclosed self-dealing or **conflicts of interest.**  Justices Scalia and Thomas, concurred in the decision but would have found §1346 unconstitutionally vague, and criticized the majority's attempt to save the statute by limiting it to bribes and kickback schemes.  *Id.* In *McDonnell,* the Court vacated the conviction, holding that "setting up a meeting, calling another public official, or hosting an event does not qualify as an 'official act'." In so doing, the Court rejected the government's argument that Congress intended to criminalize any decision or action by a public official, ruling that such an interpretation "encompasses nearly any activity by a public official." In *McDonnell,* Chief Justice Roberts wrote that the case was not about "tawdry tales of Ferraris, Rolexes, and ball gowns" but about the **Court's concern "with the broader legal implications of the government's boundless interpretation of the federal bribery statute."** *Id.* When the Court in *McDonnell* optimistically expressed a lack of concern that "[a]s to arbitrary prosecutions, we perceive no significant risk that the honest services statute, as we interpret it today, will be **stretched out of shape,"** they could have never envisioned that within three years the government would indict a citizen under a *quid pro quo* theory that broadens the honest services statute beyond recognition. *Id.* at 2372-2373.

The vagueness and federalism problems caused by the overzealous application of 18 U.S.C. §1346 are undeniable. Due process requires that a criminal law must give fair warning of the conduct that is being prohibited.  Elected officials have a right to rely on state laws and to conform their conduct to those laws. Mr. Henon's acceptance of his salary and benefits while on City Council was **lawfully permitted** by state law, and his salary was fully disclosed to the public. The government's efforts to expand the honest services fraud statute to criminalize Henon's salary and benefits to which he was authorized to accept under the City Charter violates Mr. Henon's constitutional due process rights, and as such this conviction must be overturned.

Recognizing that Mr. Henon was lawfully entitled to take his salary and benefits, the

Government desperately tried to suggest that Henon did no work for his salary in an attempt to survive a judgement of acquittal.  They failed miserably. While under cross examination, Special Agent Jason Blake revealed that while on City Council, Mr.  Henon served as a Local 98 delegate to the AFL-CIO, attended AFL-CIO conventions and meetings, attended Building Trades meetings for the local, and worked on numerous election campaigns on behalf of the local. (N.T. 10-28-21, p. 67). Brian Eddis and James Foy both testified that Mr. Henon was observed working "all the time" at the Local 98 office in Northeast Philadelphia, representing Local 98 before the Building Trades and AFL-CIO meetings, and working on election campaigns for judicial, state representative, and other elected offices. (N.T. 11-3-21, p. 96). In addition, Patrick Eiding, President of the AFL-CIO, testified that Mr. Henon represented Local 98 as a delegate to the AFL-CIO, attended monthly executive meetings of the Building Trades, and was actively involved in every significant labor event. (N.T. 11-3-21, P. 128). James Dollard, of Local 98, was emphatic in his testimony that Henon was a fixture at Local 98 headquarters while serving on City Council:

> " But as far as things for me Bobby- things never really changed. Bobby was always there. In fact every time he was stuck for a ride back to council because he needed to get there quick he would pop his head into my office and I would run him to city council." (N.T. 11-2, p. 98).

Stated simply, this is a case where an elected official was legally permitted under state law to receive an outside salary and benefits which, in return, he worked for. This was not a no-show job or a bribe disguised as a job, as we saw in *Bryant*.  Instead, this is a case where an elected official was legally permitted under state law to receive an outside salary and benefits, and in return he performed valuable legitimate work to justify receiving those benefits.  Moreover, the government offered no evidence to prove that Mr. Henon's employment was given and accepted with the specific intent to influence any of the "official actions" charged in the indictment. Instead, the evidence shows that Mr. Henon was receiving a salary and benefits and Philadelphia Eagles tickets long before 2012, and as far back as 2003. The Government's failure to prove a *quid pro quo* under the applicable standards set forth by the Supreme Court means the

Government has failed to present sufficient evidence to sustain a conviction as to Counts 1, 4-10.


**II.**    **THE GOVERNMENT FAILED TO PROVE THAT ROBERT HENON PERFORMED THE OFFICIAL ACTS CHARGED IN COUNTS 4-10 AND THAT HE DID SO ON BEHALF OF JOHN DOUGHERTY**

This case involves the criminalization of politics. In Counts 1, and 4-10, Robert Henon was convicted of 1) calling another elected official and advising the official of a complaint that he had received regarding  violations of the city code; 2) discussing delaying plumbing legislation without ever doing so;  3) directing an intern to draft a resolution that prohibited illegal conduct by towing companies and later deciding not to submit the resolution;  4) setting up a meeting and recessing a hearing in connection with the Comcast Franchise Agreement; and 5) voting for a Soda Tax that he had long supported and which created important revenue for schools and child care programs. The fears expressed by Justice Scalia, and Chief Justice Roberts have become realized. The government has relied on the vagueness of the Honest Services Fraud statute to prosecute an elected official for taking actions that are customarily performed in the course of his duties, and which are in the best interests of his constituents.

The Supreme Court in *McDonnell* rejected the traditionally overbroad definitions of an official act. The *McDonnell* Court held that an in order to prove an "official act" the government must identify a  "question, matter, cause, suit, proceeding, or controversy, which may at any time be pending or which may by law be brought before any public official, in such official's capacity, and they must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id. at 2365.* The Court clarified that a "question, matter, cause, suit, proceeding, or controversy," must be a " **formal exercise of governmental power** that is similar to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id. at* 2372. Moreover, the *McDonnell* Court recognized that not every decision or action "customarily performed by a public official, such as the myriad decisions to refer a constituent to another official, constitutes an official act. *Id. at*

2371. Vague assertions of influence are not enough, instead, the government prove the official

used "his position to exert pressure on another official to perform an official act by that official."

*Id. at* 2372. *McDonnell* made it unmistakably clear that "setting up a meeting, talking to another

official, or organizing an event-without more" does not constitute an official act. *Id.* A careful

examination of the so-called "official acts" charged in Count 1, and 4-10, clearly reveals that in

each instance the actions of Mr. Henon were not "official acts", and they were not done behalf of

or at the direction of John Dougherty.


A.   **THE GOVERNMENT FAILED TO PROVE THAT ROBERT HENON
     PERFORMED AN OFFICIAL ACT BY NOTIFYING L&I INSPECTOR
     CARLTON WILLIAMS OF A COMPLAINT OF A CODE VIOLATION AT CHOP**


The jury convicted Mr. Henon on Count Four which charged him with Honest Services

Wire Fraud ( L&I/ CHOP) in reference to the direct deposit of his paycheck from Local 98 on

August 18, 2015. The indictment alleged that Mr. Henon performed an "official act" when he

notified L&I Chief Carlton Williams of a complaint of unlicensed work being performed at

CHOP.  An application of the aforementioned case law to Mr. Henon's conduct in notifying

Carlton Williams of a possible code violation at CHOP, compels the conclusion that Mr. Henon

took no official action whatsoever. It is undisputed that Mr. Henon did nothing more than make a

call to Mr. Williams of a complaint that he received from a constituent. Mr. Williams testified that

it was "his job" to take calls from City Councilmembers, other politicians, and citizens regarding

such complaints. (N.T. 10-21-21, p. 69). Moreover, Mr. Williams testified that Councilperson

Henon exerted no pressure on him, and never asked him to do anything unlawful or unethical.

(N.T. 10-21-21, p. 73). The evidence further established that it was Henon's duty to report alleged

violations to L&I. More importantly, there was no evidence presented that Mr. Henon did

anything other than make a phone call to report a valid complaint, and there was no evidence that

he took part in a "formal exercise of power in a question, matter, cause, suit, proceeding, or

controversy" within the meaning of an "official act" under *McDonnell.* The Supreme Court made

it clear in *McDonnell* that contacting another official is not an "official act." The act of notifying

another elected official of a complaint is not a crime.

      For these reasons, a judgement of acquittal must be granted as to Count Four.


### B.  THE GOVERNMENT FAILED TO PROVE THAT ROBERT HENON TOOK AN OFFICIAL ACTION IN REFERENCE TO THE PLUMBING CODE


      Mr. Henon was convicted on Count Five which charged him with Honest Services Wire

Fraud in connection with a phone call made on August 20, 2015, referenced in the verdict slip as

Plumbing Code/ Building Trades. The indictment alleges that Mr. Henon delayed plumbing code

legislation at the request of John Dougherty. Firstly, there is no evidence whatsoever that Mr.

Henon "introduced and then delayed legislation involving the Plumbing Code, or that he ever took

any action whatsoever with regard to the Plumbing Code. Instead, the government introduced a

tape recorded conversation with John Dougherty in which Mr. Henon ranted about "screwing" the

plumbers, and discussed "leveraging them for internal trade politics". However, there was no

evidence introduced that Mr. Henon ever did so. In fact, there were no fact witnesses presented

during the trial who actually addressed the Plumbing issue, or who testified that Mr. Henon

performed an official act regarding plumbing.   Agent Blake confirmed during his testimony that

there was no plumbing legislation ever developed or introduced by Mr. Henon, and certainly there

was no indication that Mr. Henon thereafter took any steps to perform the official act that he was

convicted of.  In sum, Mr. Henon was convicted of discussing the taking an action that he never

took. Clearly, there was insufficient evidence to prove that Mr. Henon took a formal exercise of

power in a question, matter, cause, suit, proceeding, or controversy relating to the plumbing code.

As such, a judgement of acquittal must be granted as to Count Five.

C.  **THE GOVERNMENT FAILED TO PROVE THAT ROBERT HENON TOOK AN OFFICIAL ACTION IN REFERENCE TO TOWING AT THE DIRECTION OF JOHN DOUGHERTY**

Mr. Henon was convicted on Counts Six and Seven which charged him with Honest Services Wire Fraud in connection with the direct deposit of his paycheck on September 29, 2015, and the transmission of an email from a staff member on September 30, 2015, referenced on the verdict slip as Towing. The indictment accuses Mr. Henon of "drafting a towing resolution" at the direction of John Dougherty, as a result of Dougherty's car being towed in September of 2015. The evidence presented at trial proved otherwise.

On June 24, 2015, Mr. Henon's car was towed by George Smith Towing. (Exhibit RH-92). Thomas Holyroyd, a government witness, testified that Mr. Henon was angry, upset and frustrated after his car was towed by George Smith Towing, and that he then tasked his staff with investigating the towing practices in Philadelphia. (N.T. 10-19-21, p. 82-83). Courtney Voss also testified that Henon was extremely angry about his towing experience in June, and she further described how the staff immediately began working towards a resolution as a direct result of that experience. (N.T. 11-4-21, pages 145-153). In the weeks that followed Mr. Henon and his staff began working towards implementing a towing resolution. Agent Blake confirmed that on August 20, 2015, Mr. Henon called Vernon Price of the Philadelphia District Attorney's Office regarding the towing problem. and was told that they were commencing a grand jury investigation into towing. (N.T. 10-19-21, p. 49).  Agent Blake further testified that on August 20, 2015, an email was sent by Chris Creelman of Mr. Henon's staff which read "I would not yet since PPD is investigating and don't want to jeopardize the investigation.

Courtney Voss testified that after returning from the end of summer recess, the staff continued to work towards a towing resolution. (N.T. 11-4-21, pages 145-153). The government's own witness, Thomas Holyroyd confirmed that it was Henon's own unpleasant experience with George Smith Towing which led to the drafting of the resolution. Holyroyd testified to the

following in response to AUSA Witzleben's questions:

> (AUSA Witzleben)  Q.  And do you actually remember a time when you heard Councilman Henon talking about his car being towed?
>
> (Thomas Holyroyd)  A.  Yes. The incident was very frustrating to him, he was in the office around this time **discussing the resolution** upset about it.
> (N.T. 10-19-21, p 83).

Holyroyd went on to testify that after drafting the resolution he cautioned against introducing it because it would seem vindictive given Mr. Henon's personal experience:

> (Thomas Holyroyd)  I expressed that using the hearings to go after one tower which the **Councilman had a negative experience** with would make him vindictive.

In their closing arguments to the jury, the Government suggested that Mr. Holyroyd must be mistaken. Yet, they rely on Holyroyd's recollections when it comes to Comcast and other aspects of the case. The truth is that the Government is horribly wrong in its assertion that Mr. Henon and his staff drafted a towing resolution because John Dougherty's car got towed or because Robert Henon took a paycheck from Local 98. In fact, as Ms. Voss testified, Mr. Henon never introduced the legislation because of the pending investigations of the Pennsylvania Attorney General and the Philadelphia District Attorney. Moreover, Ms. Voss confirmed that she learned from another Councilmember's staff that they were planning on introducing legislation and ultimately did so. (N.T. 11-4-21, pages 151-153).

Clearly, there was insufficient evidence to prove that Councilman Henon performed the official act of drafting a resolution because John Dougherty's car was towed, or because he was bribed to do so. More importantly, having an intern draft a resolution that is never proposed is not an official act. Using the Honest Services Fraud statue to prosecute a city councilmember for tasking an intern to prepare a draft of a resolution that is never introduced is the type of overbroad

and "boundless interpretation" of the law that Chief Justice Robert's condemned in *McDonnell.* A

judgement of acquittal must be granted as to Counts Six and Seven.

D. **THE GOVERNMENT FAILED TO PROVE THAT ROBERT HENON TOOK AN OFFICIAL ACTION BY ALLOWING JOHN DOUGHERTY TO INFLUENCE THE COMCAST FRANCHISE AGREEMENT**

Mr. Henon was convicted on Counts Eight and Nine which charged him with Honest

Services Wire Fraud in connection with an email sent on November 24, 2015, and the direct

deposit of his paycheck on December 8, 2015, referenced on the verdict slip as Comcast.  The

indictment alleges that Mr. Henon "allows Dougherty to influence the Comcast Franchise

Agreement." The government argued at trial that Mr. Henon performed official acts when 1) he

arranged a meeting between John Dougherty and Mark Riley of Comcast during the Comcast

Franchise negotiations, and 2) when he briefly recessed a meeting of the Public Property

Committee prior to its vote on the Comcast Franchise Agreement.

In *McDonnell,* the Supreme Court held that arranging a meeting, contacting another

official, or hosting an event does not standing alone qualify as an "official act".  Similarly, calling

a brief recess of a Committee Meeting does not rise to the level of a formal exercise of power as

required under *McDonnell.* Instead, Mr. Henon did nothing more than negotiate on behalf of the

stakeholders and constituents he was elected to serve. Numerous witnesses confirmed that Mr.

Henon and his staff worked tirelessly over the course of a year trying to negotiate on behalf of the

many different interest groups, politicians, unions, and other stakeholders who were asking for

concessions from Comcast in the Franchise agreement. Mr. Henon's actions in arranging two

meetings between Comcast representatives and the leader of the Building Trades is neither a crime

nor an official act. A judgement of acquittal must be granted as to Counts Eight and Nine.

E. **THE GOVERNMENT FAILED TO PROVE THAT ROBERT HENON VOTED FOR THE SODA TAX TO RETAILIATE AGAINST THE TEAMSTERS UNION ON BEHALF OF JOHN DOUGHERTY**

Mr. Henon was acquitted on Counts Two and Three in which he was charged with Honest Services Fraud in connection with Soda Tax #1. Inexplicably, the same jury convicted him on Count Ten of Honest Services Wire Fraud in connection with Soda Tax #2. The defendant was wrongfully convicted based on the evidence produced at trial.

The indictment alleges that Robert Henon "threatened to propose a soda tax in May of 2015 because of a political commercial sponsored by the Teamsters Union which portrayed John Dougherty in a negative light. The government presented this same false narrative at trial. In response, the defense presented overwhelming evidence that Robert Henon and his staff had been actively pursuing support for the Soda Tax as early as February of 2015, three months before any commercial involving Mr. Dougherty, and he supported the tax for reasons that had absolutely nothing to do with John Dougherty.

Kevin Vaughn, who has served the City of Philadelphia for decades, provided uncontradicted testimony that Councilman Henon and his staff reached out to him for his support in pushing the soda tax in February of 2015. Mr. Vaughn provided his calendars for those months which corroborated his testimony that he met with Henon and his staff to resurrect the Soda Tax. (N.T. 11-3-21, pages 32-33). The defense introduced an email of April of 2015, Exhibit RH- 7, in which Eric Horvath was researching the soda tax legislation in Berkley, California. Stated simply, there was absolutely no truth to the government's assertion that Mr. Henon began supporting the soda tax in May of 2015 as a result of a Teamster Commercial about John Dougherty. Kevin Vaughan, Jolene Byzon, and Courtney Voss all testified that Mr. Henon supported the tax for the revenue that it would provide for Pre-K, parks, programs, and the health reasons associated with child obesity which was a cause that Henon had long championed. Each witness confirmed that there were insufficient votes on city council in 2015 to put forth the legislation.

The evidence at trial proved beyond the shadow of any doubt that in 2016 it was Mayor Jim Kenney who sought to introduce the Soda Tax as his first major piece of legislation. (N.T. 10-18-21, p. 52). Kevin Vaughan, Jolene Byzon, Eric Horvath, and Courtney Voss all testified that Henon believed the tax was a necessary alternative to increased property taxes, and because the tax would provide much needed revenue for worthy causes. Not one witness testified at trial that Robert Henon supported the Soda Tax and voted for it because of the teamsters or because of John Dougherty. Quite frankly, it is shocking that the government continues to push this false narrative.

There is insufficient evidence to support the defendant's conviction on Count Ten.


### III.   THE GOVERNMENT'S FAILURE TO PROVE A *QUID PRO QUO* REQUIRES THAT A JUDGEMENT OF ACQUITTAL BE GRANTED AS TO COUNTS 12 AND 16

Mr. Henon was convicted on Counts 12 and 16, in which he was charged with Honest Services Wire Fraud and Federal Program Bribery in connection with an October 20, 2015 campaign check in the amount of $5,000. The indictment alleged that Robert Henon engaged in Honest Services Fraud and Federal Program Bribery by taking official actions to pressure Verizon to settle a labor dispute with the CWA because he was bribed with campaign contributions. Instead, the evidence presented at trial made it unmistakably clear that Mr. Henon never promised anyone from CWA that he would perform an official act in return for the contribution.

Political contributions and fundraising are an important, unavoidable and legitimate part of the election process. The law recognizes that political contributions may be given to an elected official, and often are, because the giver is supporting official acts performed by the official, and with the hope that the official will engage in similar acts in the future. For this reason, our Courts have demanded a heightened burden of proof in cases in which campaign contributions are charged as bribes.

In *McCormick v. United States,* 500 U.S. 257, (1991), the Supreme Court held that a defendant can be convicted of extorting campaign contributions under color of official right "**only**

**if the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act."** *See United States v. Menendez,* 137 F. Supp 3d 635, 641-43 (D.N.J. 2015). *See also United States v. Ganin,* 510 F. 3d 134 (2d. Cir. 2013). No such promise exists in this case.

The evidence presented at trial established that on September 10, 2015, James Gardler, a CWA official and friend of Mr. Henon contacted him and asked his support in convening a hearing regarding the Verizon Franchise Agreement. Gardler sought Henon's support in connection with ongoing labor issues between the CWA and Verizon. Specifically, Gardler advised Henon that Verizon was breaking the backs of the union workers by requiring them to work enormous amounts of overtime and were also outsourcing jobs to foreign countries. (N.T.10-14-21, pages 49-50). Henon, a lifelong union member, was only too happy to lend his support.

During this same time period, Mr. Henon was running for reelection and had hired Rachel Doran, a campaign consultant to manage his fundraising. Ms. Doran testified that she arranged and organized call sessions in which Mr. Henon would come to her office and she would monitor his campaign solicitation calls. (N.T. 11-4-21, pages 43-51). Ms. Doran confirmed that Mr. Henon was scheduled for a call session in her office on September 23, 2015 between 11am-4pm. (N.T. 11-4-21, pages 43-51). Exhibit RH–138 listed her calendared dates for September–December 2015. During this September 23, 2015 call session, Mr. Henon made numerous calls soliciting donations which were intercepted by the government. ( N.T. 11-8-21, p. 38, stipulation). In one of those calls, Mr. Henon called Mr. Gardler, and solicited a donation from the CWA. Mr. Henon announced to Gardler that "this is a political call", and during the call Henon asked Gardler for a campaign contribution from both the local and national CWA . (N.T. 10-14-21, pages 56-57). At the end of the call, Mr. Henon told Gardler that he has something "not related" to discuss and notifies him that he will call him back.  Mr. Henon then tells Gardler that he will call him back and hangs up. Mr. Henon then immediately  calls  Mr. Gardler back, and Gardler actually questions Mr. Henon on why he had to make separate calls. (N.T. 10-14-21, pages 56-57). At no time during the call did Mr.

Henon imply or tell Gardler that in return for the contribution he would perform an official act.

Rachel Doran testified to Henon's practice of separating calls in this manner. (N.T. 11-4-21, P. 51). The evidence presented at trial established that at the time of the calls, Henon was running for re-election and was actively seeking campaign contributions from other labor unions, businesses and individuals. The CWA had been a longtime financial supporter of Henon, and had made donations to his campaign dating back to his first campaign in 2011, in which they donated $4,500 in that year alone. After Gardler agreed to make a campaign donation during the September 23, 2015 call, Mr. Henon had his campaign advisor, Rachel Doran contact Mr. Gardler and the CWA to follow up on the contribution.  Significantly, Mr. Gardler has never been charged with bribing Councilman Henon.

The intercepted conversations between Gardler and Henon are clear and unambiguous. At no time did Henon promise anything in return for the contribution. Instead, Henon made it abundantly clear that this was a **political call**. Obviously, there is no evidence on the record to support a conviction based on the campaign contributions of the CWA. There is no evidence of an express or explicit promise, and there is no *quid pro quo* as required under *McCormick* and it's progeny. The evidence is insufficient to support a conviction of Counts 12 and 16.

## **CONCLUSION**

Robert Henon has never taken a bribe in his life. This is a case where the Federal Government unconstitutionally weaponized the Honest Services Fraud statute to prosecute an elected state official for receiving a salary and benefits to which he was lawfully entitled to receive under state law. The government has ignored the stern warnings from our Supreme Court that their continued overbroad interpretations of the statute will lead to wrongful prosecutions and undermine the due process protections of elected officials. In addition, the government now seeks this Court's approval to expand the definition of Honest Services Fraud and Federal Program Bribery to include any lawful salary or campaign contribution which is given to an elected official who in the future communicates or supports that employer or contributor in any meaningful way. This misuse of the Honest Services Fraud and Federal Program Bribery statutes has led to the wrongful conviction of a good citizen. This Court now has the ability and the obligation to right this wrong, and to prevent this injustice.

For all of the reasons set forth above, a judgment of acquittal must be granted as to all counts.

Respectfully Submitted,

/s/ Brian J. McMonagle
Brian J. McMonagle, Esq
McMonagle Perri McHugh
1845 Walnut St. 19th Floor
Philadelphia, Pa 19103
*Bmcmonagle@mpmpc.com*