**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 19CR64** |
| | ) | |
| **ROBERT HENON** | ) | |
| | ) | |

SENTENCING MEMORANDUM OF
<u>DEFENDANT ROBERT HENON</u>

Defendant Robert Henon, through his undersigned counsel, submits this memorandum to assist the Court in determining a fair and just sentence.  One that is sufficient, but not greater than necessary, to meet the goals of sentencing, as required under 18 U.S.C. § 3553.

I.     <u>INTRODUCTION</u>

Service to individuals, to family, and to the community at large has been the principal motivating theme in Mr. Henon's life since he was a teenager.  For the reasons stated below, his life of service and the nature of the offense support a substantial downward variance from the applicable guideline.

The parties agree on the applicable guideline range—Level 30 on the application of 2C1.1 to the facts of the case—resulting in a range of 97 to 121 months.  However, the defense submits that the Court should exercise its power to vary downward based upon Mr. Henon's history and character, the nature and circumstances of the offense conduct and because the ordinary statutory correctional goals of just punishment, reflecting the seriousness of the offense, promoting respect for the law, and deterrence support a sentence which is substantially less severe than the advisory guideline.

The defense recognizes that the principal and long-lasting harm flowing from Mr. Henon's conduct can be best described as its adverse impact on public trust.  But measured

against the harms caused by the offense conduct are Mr. Henon's life-long commitment to public

and private service and the fact that the offense conduct as found by the jury is on the mitigated

end of a broad spectrum of conduct encompassed by the law of honest services fraud.  In sum,

Mr. Henon's history of service to his community – which started well before the offense conduct

and will continue to the end of his life – should be considered as part of a downward variance

under section 3553(a), and the statutory purposes set out in section 3553(a)(2) will be amply

served by a brief sentence of incarceration.

II.     SECTION 3553(a) FACTORS TO BE CONSIDERED

After correctly calculating the sentencing guidelines and giving fair consideration to

potential departure bases, ultimately the Court must impose a sentence sufficient, but not greater

than necessary, to comport with the goals of sentencing.  18 U.S.C. § 3553(a).  In doing so, the

Court must consider the variety of factors articulated in section 3553(a) and determine whether

an upward or downward variance from the guidelines is warranted based on the particular

circumstances of a defendant's case.  The circumstances of Mr. Henon's case allow this court to

impose a sentence below the guidelines range that will nonetheless provide a just result.

a.   Mr. Henon's Personal History and Characteristics Under § 3553(a)(1)

*Dedication to Community*

The narratives of the indictment and trial tend to mask the rest of Mr. Henon's life, which

is rich with a commitment to service to others.  Since Mr. Henon was eighteen years old, he

exhibited a commitment to helping the community around him to improve and thrive.  The letters

submitted to the Court from family, friends, community leaders, constituents, and others that

know Mr. Henon demonstrate that his commitment to his community is broad, deep and long

lasting and that he is a positive influence in his community as a father, son, friend, and advocate

for those in need.  Mr. Henon is driven by a desire to be "A Man for Others."  Hugh Allen Ltr., Tab 7.[1] It was this "drive" that motivated Mr. Henon's involvement in a neighborhood watch when he was eighteen, his later work as a ward leader, his work before his election to City Council as political director for the Local IBEW 98, and his desire to run for councilperson for the 6th District in 2011.  *See, e.g.*, Scott McIntyre Ltr., Tab 23; Dawn D'Agostino Ltr., Tab 1; Karen Boyle Ltr., Tab 9. Mr. Henon was never motivated by greed or any penchant for political power; rather, his motivation for political work was always to help his neighborhood, his community, his city, his fellow laborers, and, later, his constituents.  *See* Dawn D'Agostino Ltr., Tab 1.

In his capacity as councilperson and as an elected official, Mr. Henon had a duty to serve his district.  We do not intend to overstate the value of work done in service of an obligation as an elected official.  However, it is illuminating to examine the opinions of those he served to determine whether the nature of the conduct for which he was found guilty permeated through to his conduct as a councilperson generally.  In Mr. Henon's case, the answer is a resounding "No." Looking past the offense conduct, one finds a person who went above and beyond any duty he had as an elected official to serve the citizens of Philadelphia because of an internal and highly personal calling.  *See, e.g.*, John McBride Ltr., Tab 76; Connie Dougherty Ltr., Tab 111; Frank Ciamberlano Ltr., Tab 108; James Lee Ltr., Tab 20. For example, he served citizens outside of his councilmanic district, even those who likely would not cast a ballot in any future political race.  B. Byrne Ltr., Tab 49; Ron Greller Ltr., Tab 121; Jeff Stever Ltr., Tab 167.  Mr. Henon's attentiveness to his work as councilman is hard to find.  Only a person truly dedicated to serving

---

[1] References to "Tabs" herein refer to the binder of Letters Submitted in Support of Robert Henon, filed with the Court.

the public would elicit such strongly worded support letters from those they served.  Some of Mr. Henon's other work for the city while acting as councilperson included:

- Opening a District Office (for the first time in the history of the 6th District) and fully staffing it so that working people and seniors in northeast Philadelphia could actually access services. That office has served between 12,000 to 20,000 people each year with everything from neighbor and landlord issues to potholes and trees. Mr. Henon hired a senior programs coordinator to help serve the large population of older adults and planned dozens of events for seniors and the community every single year.

- Opening a full-service food bank and diaper bank, which provides residents from all over the city with critical resources when they need them most.  At the height of the pandemic, these resources served more than 800 families each week.

- Opening a one-of-a-kind arts center called the Tacony LAB, which provides free arts programming to Philadelphia residents and provides a hub for northeast Philadelphia artists to access resources and services.

- Hosted COVID-19 vaccine clinics for more than 3,500 northeast Philadelphia residents.  Mr. Henon's office managed registration for vaccine clinics, implemented a vaccine referral system for residents and was responsible for overseeing the coordination of the City's only homebound vaccine program.

- Establishing a partnership with SEPTA to be the largest provider of senior SEPTA services in the northeast. Through this partnership more than 500 senior citizens have been able to access SEPTA ID services from his District Office.

- Investing in technology designed to connect residents to City government in new and innovative ways. Mr. Henon secured funding for creation of an app and a texting program through which residents could submit questions and complaints 24/7.

- Fighting for northeast Philadelphia police officers and for funding for new police facilities. Mr. Henon was successful in getting 30 new officer positions and millions of dollars for police facilities in the northeast.

- Launching a citywide childhood obesity and wellness program for Philly kids that now serves more than 72 recreation centers. The program serves more than 6500 kids each year.

- Providing free Narcan® and training in overdose reversal to combat the opioid epidemic.  Mr. Henon also passed legislation which requires

pharmacies to carry Narcan® in stock.

- Offering free CPR training and certification to an average of 1000 Philadelphians each year in an effort to strengthen the cardiac arrest chain of survival.

- Serving on more than a dozen City Council Committees, including chairing the Committees on Public Property and Public Works and Licenses and Inspections and Vice Chair of Finance and Public Health and Human Services. In his role as Chair of the Committee on Licenses and Inspections, Mr. Henon sponsored hearings regarding the Underground Economy to address unsafe practices and unlicensed contractors costing the City money in tax revenue and placing vulnerable workers in unsafe conditions.

- Serving on the Governors Uniform Construction Code Review Advisory Committee as the City of Philadelphia's representative, the Glen Foerd Board of Directors, the Animal Care and Control Team Board of Directors, the St. Patrick's Day Advisory Committee, the Mayor's Fund for Philadelphia and the Philadelphia Shipyard Development Corporation.

- Refocusing the City on programs and services to benefit manufacturers. Because of Mr. Henon's efforts, new manufacturers opened their doors and existing manufacturers expanded, including Northeast Building Products, Stockwell, Morris Iron and Steel, Revolution Recovery, Leonardo, Honor Foods and dozens of others. Manufacturing jobs are blue collar, family sustaining jobs that Philadelphia needs. As co-chair of the Manufacturing Task Force, Mr. Henon worked with business, civic and education leaders to create and implement a plan to expand the manufacturing industry in Philadelphia. This effort helped secure hundreds of new jobs in the 6th District with the expansion of manufacturing jobs.

- Holding landlords accountable for the impact that poorly maintained properties have on neighborhoods through his Bad Neighbor Initiative and the Problem Property Advisory Committee.

- Passing legislation that strengthens regulations on bandit signs, streamlines the zoning notification process, tightens demolition and construction licensing requirements, combats worker misclassification and allows residents to put trash out early. Mr. Henon also completed the first comprehensive re-write of the property maintenance code in decades and was actively involved in the overhaul of the Zoning Code. After City Council adopted the new Zoning Code, Mr. Henon provided quarterly training and training scholarships to organizations and individuals to learn the code and zoning processes so that they could more effectively engage in neighborhood-based land use decisions.

- Successfully advocating for northeast Philadelphia's public schools. Through this advocacy and in partnership with northeast parents, the Philadelphia School Board funded new school buildings for three of northeast Philadelphia's overcrowded elementary schools and constructed a brand-new state of the art K-8 school in Mayfair.

- Supporting city-wide efforts to make the property tax reassessment system more fair and equitable and to provide property tax relief to all Philadelphians. As a result of these efforts, including the Homestead Exemption, approximately 90% of 6th District households saw a decrease in their property taxes.

- Standing shoulder to shoulder with the nurses' union, the teachers union, the transit workers union, hospital workers union, domestic workers union, court employees union, stagehands union, firefighters, police, DC 47 and 33 (city unions), airport workers union, and trades unions. Not only did Mr. Henon support legislation aimed at advancing union issues, causes, and contracts, he also walked picket lines, participated in protests and rallies, and was regularly invited to speak and even invited to negotiations.

- Funding and forming a coalition of service providers to increase access to critically needed social services in the northeast Philadelphia. The coalition is called NESTco and is made up of more than 40 partner organizations.

Various personal anecdotes support the proposition that Mr. Henon lived to serve others outside of any political or monetary gain it might result in for him. After politician Gregg Kravitz lost a political race – and with it, his influence – Mr. Henon stood apart from others in the political world when he offered personal time and effort to help Mr. Kravitz to secure employment. Gregg Kravitz Ltr., Tab 19. Pastor Ray, of the Kingdom Life Christian Center in Mayfair, testified at trial that Mr. Henon helped the church when it faced race-based discrimination and bigotry from its own neighbors, who threatened to burn the church down over a zoning dispute. Mr. Henon helped the church get the zoning permit it sought. As Pastor Ray states in her letter, Mr. Henon provided "relentless service" to the pastor and her ministry for years, and the Pastor described Mr. Henon as someone who is passionate about service to others – he "love[s] to help people." Pastor Danette Ray Ltr., Tab 83.

Mr. Henon is an outstanding and integral member of his community. While this conviction will not stop his service to the community, a lengthy term of incarceration will. Councilmember or not, the community relies on Mr. Henon and should not be deprived of an individual who cares so deeply and works so tirelessly on its behalf. Kristen Lepkowski Ltr., Tab 21.

Community member and friend Michael Jackson described Mr. Henon's communal and family-focused spirit, writing, "One Thanksgiving Eve Bob called me and said he wanted to set up an early morning Thanksgiving football game. Sons versus Dads. I didn't think he could pull it off in such a short time but he did. Well over 20 fathers and sons showed up on that cold morning all because one dad Bob Henon believed in getting others together." Michael Jackson Ltr., Tab 18.

Mr. Henon has helped various civic and community associations as well as religious institutions further their missions by advocating for community projects, playgrounds, youth sports programs, recreation centers, and other positive fixtures that are crucial to the development and prosperity of neighborhoods in Philadelphia. *See, e.g.*, Ltrs. Binder Section "Community leaders – members" and "Constituents." Mr. Henon himself is a Freemason. A Freemason's life is defined by integrity, friendship, respect, and charity. He is also an active member of the Ancient Order of Hiberians, an Irish Catholic fraternal organization through which Mr. Henon has dedicated personal time and money to various charitable causes. AOH Division 39 Ltr., Tab 37.

*Dedication to Family – Strength and Service in the Face of Tragedy*

Service to others is also inherent in Mr. Henon's commitment to his sobriety and the tenets of Alcoholics Anonymous, a commitment that has lasted 26 years, with more to come.

7

One of the many reasons that Mr. Henon got sober in the first place was to be in service of his family. When his younger sister committed suicide in 1997 at just 17 years old, Mr. Henon was very early in sobriety. After such a tragedy, other individuals with a family history of alcohol abuse and only one year into sobriety may have spiraled into a life of addiction. It was a defining moment for Mr. Henon, who became the pillar of support his family needed from that day forward. He stayed away from alcohol, and with his sponsor, drove to the Philadelphia Coroner's office to identify his sister's body. Mr. Henon's mother wrote about this tragedy and her son's response to it in her letter of support[2]:

> Unfortunately, alcoholism was prevalent in the Henon family. I was an alcoholic. Rob's dad was an alcoholic. Rob's brother Paul was an alcoholic. Rob was an alcoholic. I mention this because at the most difficult time in our family's life Robbie was a year sober and thank God he was. If he did not take a year away from politics, people, places, and things, he would not have been there for me and the rest of the family.... It is because of Rob's sobriety and his ability to take charge in a crisis situation that he and his AA sponsor, Ward Wright, had the God-awful responsibility of identifying his sister, my daughter, at the city morgue. Rob was the one that I depended on to make funeral arrangements and help guide decisions after suffering such a great loss.

Donna Henon Ltr., Tab 2.

From then on, while his brother Paul, his father, and his mother continued to live as alcoholics, Bobby stayed sober. And, one by one, he helped his family members get sober, too. Unfortunately, his brother, Paul, could not find a way to live life as a sober person and died from heart complications after years of drug and alcohol abuse in 2007 at the age of 37 – just 10 years after Megan's suicide. Shortly thereafter, in 2009, Mr. Henon's father died a sober man after approximately 15 years of sobriety, at only 67 years old. Mr. Henon's mother, whom he still

---

[2] Mr. Henon's mother, like much of his family and childhood friends, refers to him as "Rob" or "Robbie."

cares for, will celebrate 24 years of sobriety in April.  Both of his parents sobered up because of Mr. Henon.

Mr. Henon's cousin, Dawn D'Agostino, provided a firsthand account of his steadfastness through these compounding tragedies:

> When Megan, Robbie's sister died, I marveled at how Robbie became the parent to his parents and to our family. Robbie had the grim task of identifying Megan's body and delivering the news to his parents that Megan had died. Immediately afterwards Robbie assumed the responsibility to become the family's liaison to the police, his Church, the funeral home and to his family and friends. Ten years later, Robbie again stepped forward to serve in an identical role when his brother Paul died. In both instances, while trying to process his own grief he led his parents and our larger family through tragedy. Robbie opened his home and his heart to family and friends to lighten their loads during those awful periods.

Dawn D'Agostino Ltr., Tab 1.

Mr. Henon's service to others who were struggling was not exclusive to his immediate family members.  Throughout his two and a half decades of sobriety, he has sponsored young men struggling with drug and alcohol addiction, including literally picking those desperate for help up off of the street and helping to guide them to a life uninhibited by the throes of addiction. As lifelong friend Scott McIntyre writes, after Bobby stopped going out drinking with the neighborhood kids, they realized he stopped hanging out with them because he took the initiative to get sober.  S. McIntyre Ltr., Tab 23.  Later, that same friend would feel that Mr. Henon saved his life when his own struggle with alcoholism spiraled out of control.  *Id.*  Mr. Henon's desire to help others is part of his core being.  It led him to help other friends and newcomers in the program of Alcoholics Anonymous.  M. Lopez Ltr., Tab 22.

Another common cause for gratitude echoing throughout many of the letters submitted in support of Mr. Henon is the breadth of his efforts during the pandemic.  The start of the COVID-19 pandemic, as the Court well knows, was a time of great uncertainty and panic.  It was a time

when the most vulnerable members of our community were in dire need of guidance and aid. Mr. Henon, without fanfare, and already under indictment in this case, spent countless hours hand delivering food to seniors, the homeless, and anyone facing food insecurity across the entire city of Philadelphia.  T. McIllmurray Ltr., Tab 177.

Even beyond hand delivering supplies and food, Mr. Henon was sure to keep his community members informed and updated, including information that allowed immunocompromised individuals to get their vaccines as early as possible, when they were a prioritized cohort.  Rev. Msgr. Paul Kennedy Ltr., Tab 67.  Mr. Henon's work during the pandemic far exceeded any expectation, and even exceeded work done by organizations whose sole purpose is to help those in need.  Barbara Baur Ltr., Tab 102. These examples are abundant in the letters submitted in support of Mr. Henon, and they are illustrations of the man that Bobby Henon is.  The history of service to his community that started well before the offense conduct and will continue to the end of Mr. Henon's life should be considered as part of a downward variance under § 3553(a).

      b.   <u>The Nature and Circumstances of the Offense Under § 3553(a)(1):
This Case is on the Mitigated End of the Spectrum of Honest Services
Crimes</u>

In an honest services case there is an analytical difference between the evidence necessary to support a guilty verdict and the vast spectrum of culpable conduct, motivations for that conduct, and resultant harms— all of which are which are relevant at sentencing.  Mr. Henon does not attack the verdict. He also recognizes that the damage to public trust is present as in all public corruption cases.  Rather, Mr. Henon submits that his conduct in this case was mitigated in light of his motivations to take the actions he did and the nature of his official acts,

acts that he otherwise would have undertaken.  Accordingly, it is submitted that a downward variance or departure is appropriate.[3]

Appellate courts, the Sentencing Commission and district judges doing their duty in imposing sentence have recognized the vast spectrum of conduct within the rubric of honest services and other bribery crimes.

Appellate courts have noted that honest services fraud has proven hard to define and covers a broad spectrum of conduct.  *United States v. Wright*, 665 F.3d 560, 568-69 (3d Cir. 2012) (Ambro, J.).  For decades, courts have been "alert to [the statute's] potential breadth" and have grappled with how best to interpret its scope and constitutionality.  *United States v. Riley*, 621 F.3d 312, 324-27 (E.D. Pa. 2010).

The Sentencing Commission has also recognized the vast range of conduct covered by section 2C1.1 which applies to honest services fraud cases. The Background commentary to Section 2C1.1 recognizes that "the object and nature of a bribe may vary widely from case to case" and   that "[c]onsequently, a guideline for the offense must be designed to cover diverse situations."

---

[3] Section 5K2.0 of the Sentencing Guidelines provides that a court may depart from the applicable guideline range if it finds an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that . . . should result in a sentence different from that described."  USSG § 5K2.0(a)(1).  Further, Chapter 1, Part A of the *Guidelines Manual* states:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

USSG Ch.1, Pt. A(1)(4)(b).  It is respectfully submitted that this is an atypical case that warrants departure.

In the day-to-day administration of justice, sentencing judges have recognized the broad spectrum of conduct as is reflected in the sentencing statistics published by the Sentencing Commission.  Attached as Exhibit A is the Commission's "Quick Facts" page for bribery convictions for fiscal year 2020, during which 147 bribery sentences were reported to the Commission.  That page states that 52.4% of defendants received a variance, and of those variances, each was a downward variance.  Those variances resulted in an average sentence reduction of 69.3%.[4]  Similarly, in fiscal year 2021, 45.8% of bribery offenders sentenced under the Guidelines Manual received a variance, and of those offenders, 100% of the variances were downward.  The average sentence reduction was 56.8%.  *See* Ex. B, Sentencing Commission Quick Facts FY2021.

Finally, this Court recognized the sweep of the current state of honest services fraud in its Memorandum denying Defendant's Rule 29(a) Motion.  Nov. 23, 2021 Mem. Op., Dkt. No. 252, at 4 n.3.  The Court stated that it felt "compelled to acknowledge the potential issues with the current state of honest service fraud law," noting that "City Council members may retain outside employment in addition to their City salary and benefits."  *Id.*  Yet a Councilmember who accepts anything of value from an outside employer, "communicates with that outside employer . . . and agrees to act in relation to that communication" is at risk of violating the law.  *Id.*  Finally, "only the element of 'corrupt intent' separates [a defendant] from conviction," (*id.*), and that intent may be inferred from the stream of benefits itself.  In other words, the *quid* and the *quo* imply the *pro*, which is particularly concerning where the *quid* is otherwise legal, the *quos* are

---

[4] The defense does not want to overstate the significance of these statistics because each case is different.  Rather, they are offered to show that judges throughout the country recognize the broad swath of conduct implicated under section 2C1.1. Moreover, the data are useful as a rebuttal to the government's normal disparity argument that a guideline sentence is appropriate to avoid disparity.

actions that are very close to the line drawn by *McDonnell*, and the *quos* were actions that a labor-focused councilperson would have taken without the *quid*.

Accordingly, these authorities invite the Court to examine the offense conduct and conclude that Mr. Henon's conduct is sufficiently mitigated to support a downward variance or in the alternative, a departure.

Philadelphia law allows an elected official to maintain outside employment, which, particularly with a "stream of benefits" jury instruction, transforms a lawful salary that predated any alleged scheme into lingering *quid* that may subject an official to criminal exposure without much aggravating conduct on the other side of it. *Id.* at 28, 58; *see also* Nov. 2, 2021 Mem. Op., Dkt. No. 252, at 4 n.3. Further, the "stream of benefits" theory absolves the government of its obligation to prove an explicit *quid pro quo*. The "mixed motive" instruction has the potential to sweep relatively mitigated conduct into the rubric of honest services fraud and undermines the specific intent requirement. N.T. 11/10/21, at 60-61. For example, under the "mixed motive" bribery instruction, an official can be found guilty even if he would have made the same decision (the *quo*) had there not been a *quid* at all. The instruction on "official act" covers acts that range from decisions of great and long-lasting moment to those which have little effect on the administration of government but still may constitute a "decision or action on a question, matter, cause, suit, proceeding or controversy." *Id*. at 61.

Mr. Henon does not minimize the impact of his conduct on public trust. However, he was motivated by a lifelong commitment to organized labor, compliance by contractors with city ordinances and safety on the job. Moreover, the "mixed motive" jury instruction does not distinguish cases in which the defendant official's motives were in furtherance of a lawful cause and which may be expected from their political ties; rather, the instruction permitted conviction

13

without regard to the extent to which the *quid pro quo* exchange was a motivating factor, a substantial factor or a but-for factor in motivating Mr. Henon's decisions.

     c.  <u>Specific Deterrence, Incapacitation and Rehabilitation</u>

The Court must impose a sentence that "protect[s] the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Imposing a below-Guidelines sentence neither condones the conduct nor endangers the public; rather, it properly reflects the culpability of the defendant in light of all of the purposes of sentencing.  There is no need to imprison Mr. Henon because there is no risk that he will commit crimes in the future.  His lone foray into criminal conduct is not only an isolated occurrence but has had disastrous consequences to his life.  While the very real prospect of losing his liberty remains primary among these consequences, the personal financial and career-ending implications of his conduct are profound not only to himself, but to his family and community as well.  The collateral consequences of this case have been disastrous and utterly life-altering for Mr. Henon.  The damage to his reputation and the impact on his family have already sent the message that one must not engage in any wrongdoing. As a convicted felon, Mr. Henon's employment prospects are diminished because his skills and experience will be tainted by his criminal record.  Most importantly for Mr. Henon, however, is the fact that he will be barred from working with any union or benefit fund for 13 years after his release from prison.  Even before he was an elected official, Mr. Henon was an electrician and member of Local IBEW 98.  Thus, the 13-year bar essentially erases Mr. Henon's ability to use his training and expertise for gainful employment outside of the political world, and his conviction has effectively ended his career in politics. For anyone contemplating engaging in unlawful conduct, it will surely result in utterly life-altering and disastrous consequences as it has for Mr. Henon.

14

According to a study funded by the Department of Justice, recidivism is more likely
when a defendant has a prior criminal history, drug abuse problems, mental health issues, and
challenges with unemployment, housing, and transportation.  William Rhodes, et al., *Recidivism
of Offenders on Federal Community Supervision* at 1, Abt Associates, Dec. 21, 2012 (prepared
for Bureau of Justice Statistics and Office of Probation and Pretrial Services).  Mr. Henon has no
prior criminal history, he remains dedicated to a sober life, has no mental health issues, and will
be able to secure employment, housing, and transportation.

Factors that decrease the risk of recidivism include having a strong social support system,
marketable educational skills, a motivation to change, and age.  *Id*.  All of these apply to Mr.
Henon.  He enjoys an especially strong support system, including his church, Alcoholics
Anonymous, lifelong friends and colleagues, his family, and supporters across the city of
Philadelphia.   He has pledged to be accountable to his family, friends and community, and they
will hold him to it.  Mr. Henon's risk of recidivism could not be lower.

d.  <u>Retribution and General Deterrence</u>

While the Court must impose a sentence that "afford[s] adequate deterrence to criminal
conduct," 18 U.S.C. § 3553(a)(2)(B), it is not necessary to sentence Mr. Henon within the
guidelines to accomplish that goal.  In fact, a sentence well below the guidelines in this case
would still constitute a significant punishment and, therefore, promote respect for the law and
general deterrence.  As with specific deterrence, imposing a sentence well below the Guidelines
neither condones the conduct nor endangers the public; rather, it properly reflects the culpability
of the defendant in light of all of the purposes of sentencing.

Research on deterrence and criminal sentencing also proves that, particularly for white
collar criminals, "informal sanctions (such as social censure, shame, and loss of respect)" are

"equally important [as imprisonment] in producing the deterrent outcome."  Zvi D. Gabbay,

*Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar*

*Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).  There is no empirical evidence that

lengthy sentences provide any additional deterrent effect.  *See id*. (no evidence supporting "the

conclusion that harsh sentences actually have a general and specific deterrent effect on potential

white-collar offenders"); *see also* David Weisburd, et al*., Specific Deterrence in a Sample of*

*Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) ("It has often been

assumed by scholars and policymakers that white-collar criminals will be particularly affected by

imprisonment.  Our analyses suggest that this assumption is wrong, at least as regards official

reoffending among those convicted of white-collar crimes in the federal courts.  We find that

prison does not have a specific deterrent impact upon the likelihood of rearrest over a 126-month

follow-up period.").  Accordingly, the need for general deterrence can be fulfilled by a sentence

well below the applicable Guideline range.

   e. <u>Guidelines Range, Available Sentences, and the Need to Avoid</u>
     <u>Sentencing Disparity</u>

  While the Court must consider the Guidelines calculation as part of the sentencing

process, the Guidelines merely "serve as one factor among several courts must consider in

determining an appropriate sentence."  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Rather than simply impose a sentence within the Guidelines range, the Court must consider the

whole range of factors listed in 18 U.S.C. § 3553 and determine the sentence that is "'sufficient,

but not greater than necessary,' to accomplish the goals of sentencing."  *Id*. at 101 (quoting 18

U.S.C. § 3553).  Indeed, the Court may not even "presume that the Guidelines range is

reasonable," but "must make an individualized assessment based on the facts presented."  *Gall*,

552 U.S. at 50.  In determining the sufficient sentence, it is important to examine the ruination

that Mr. Henon has already suffered as a result of his conduct and this prosecution and conviction.  While these consequences are not a complete substitute for judicial punishment, they are critically important to assessing what further punishment is necessary in this case.

The sentencing court has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless."  *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted).  Here, the 3553(a) factors overwhelmingly support a sentence that is well below the applicable Guidelines range.

Section 3553(a)(6) requires the Court to avoid "unwarranted sentence disparities among defendants who have been found guilty of similar conduct."  Often, the government argues that sentencing within the applicable guideline range is a means to accomplish that goal.  That reasoning fails in this case for this reason: The Background commentary to Section 2C1.1 recognizes that the guideline was "designed to cover diverse situations."  In practice, sentencing judges recognize this "diversity," which is reflected in the sentencing statistics published by the Sentencing Commission.  *See infra* Section II(b) for a discussion of the Sentencing Commission data; *see also* Exs. A and B (showing in FY2020 147 bribery sentences were reported to the Commission; 52.4% of defendants received a variance, and of those variances, each one was a downward variance with an average sentence reduction of 69.3%).  As stated in Section II(b), the defense does not want to overstate the significance of these statistics but they are useful for more than merely rebutting the government's normal disparity argument because sentencing judges across the country recognize the very point the defense makes concerning the offense conduct:

that honest services fraud and Section 2C1.1 apply to a broad spectrum of conduct, motivations and harms.  That premise invites the Court to examine the offense conduct and conclude that Mr. Henon's conduct is sufficiently mitigated to support a downward variance.

      f.   The Seriousness of the Offense, Promoting Justice and Respect for the Law to Just Punishment

It is appropriate to address these matters last because they are the essential "purposes" to be accomplished based on all the factors articulated in the statute.  The Court cannot discard consideration of the impact of political corruption on public trust.  Mr. Henon faces the loss of his ability work for a labor union or benefit plan, he cannot seek public office again, and he has forfeited his pension as a former city employee.  He has lost the means of public service which this record demonstrates is precious to him.  He has suffered public humiliation and will incur whatever financial penalties the Court imposes.  A jail term at or near guideline level 30 is not necessary in order to reflect the seriousness of the offense or to promote justice and respect for the law.

III.   FINANCIAL ASPECTS OF SENTENCING

      a.   Restitution Should Not Be Imposed

The PSR asserts that a restitution order is required under 18 U.S.C. § 3663A in the amount of the "bribe," consisting of the total of Mr. Henon's salary and benefits over the charged conspiracy period on the ground that Local 98 was a victim because Mr. Henon did not do any work for the union.  The government bears the burden of proving that restitution is appropriate and its amount.

A restitution order is inappropriate for at least three reasons.  First, Local 98 was not a victim as defined by section 3663A; rather, according to the verdict and the government's theory, the Union was the beneficiary of Mr. Henon's official acts.  Second, Mr. Henon did perform

18

*other work for the Union which was not part of any alleged quid pro quo*.  Third, this Court

should find, under 18 U.S.C. § 3663A(3)(B), that the determination of the complex issues of fact

related to the cause or amount of the Union's losses for restitution purposes unnecessarily

complicates and prolongs the sentencing process such that it is a burden which outweighs the

need to provide restitution to the union.

### i.  Local 98 is Not a Victim Under the Mandatory Victim Restitution Act

The Mandatory Victim Restitution Act ("MVRA") requires court-ordered restitution to

"victims."  A victim is defined as a "person directly and proximately harmed as a result of the

commission of the offense," including in a conspiracy, as the case is here. *Id.* §

3663A(a)(1)(B)(ii)(2).  Local 98 was not harmed as a result of the commission of the offenses

for which Mr. Henon was convicted.  Moreover, Mr. Henon served to advance a pro-organized

labor and pro-building trades agenda on City Council, and Local 98 was the principal beneficiary

of his efforts.  To characterize them now as a victim is inappropriate and not in accordance with

the mandate of 18 U.S.C. § 3663A.

The government reasons that Local 98 is a "victim" because Mr. Henon had a no-show or

low-show job.  In support of its argument, the government cites *United States v. Bryant*, 655

F.3d 232, 252 (3d Cir. 2001), in which the Third Circuit, under an abuse of discretion standard,

upheld the district court's use of the amount of the bribe to determine restitution and held that

restitution may be offset by work done for the alleged "victim," but the burden is on defendants

to present evidence of the work performed.

In fact, *Bryant* supports the defense argument that Local 98 is not a victim under the

MVRA.  Wayne Bryant was a state senator with significant authority over state funding of state

medical educational institutions.  He was given a low-show job at the New Jersey School of

Osteopathic Medicine ("SOM") which was a <u>component</u> of the University of Medicine and Dentistry of New Jersey or ("UMDNJ").  As a state senator, he steered funding away from UMDNJ to SOM.  In essence, he was convicted of being bribed by SOM to impoverish UMDNJ by steering state money that otherwise would have gone to UMDNJ.  Noting that the two entities could not be treated as one, the court of appeals upheld the use of Bryant's SOM salary as the measure of the harm to UMDNJ which had seen its grant allotments reduced as a proximate result of the bribe.  Notably, SOM, like Local 98, paid Bryant the alleged bribe consisting of a salary for a low show job.   Bryant's failure to perform services other than the alleged *quo*— Bryant's advocacy for SOM in connection with state funding—did not render SOM a victim for purposes of restitution, because SOM benefitted from the scheme.  In this case, Local 98 was not a victim because Local 98 was largely the beneficiary of Mr. Henon's official acts.

        ii.    <u>Mr. Henon Performed Services to Local 98 Separate From His Official Acts</u>

The PSR also notes that Local 98 "did not receive any legitimate services from Henon in exchange for his salary."  Addendum to PSR, p. 42.  Aside from the fact that the union benefitted substantially from Mr. Henon's actions, Mr. Henon performed other legitimate services that would offset any restitution amount.  Agent Blake, the government's witness at trial, confirmed that the investigation into Mr. Henon revealed that he was a delegate of the AFL/CIO while serving on city council.  N.T. 10/28/21 at 67:10-13.  He also attended monthly AFL/CIO meetings and AFL/CIO fundraisers on the union's behalf.  N.T. 11/02/21 at 57:21-58:3-11; N.T. 11/3/21 at 128:17-129:2, 142:10-20. Agent Blake confirmed that Mr. Henon was participating in judicial, local, and state campaigns on behalf of Local 98.  N.T. 10/28/21 67:17-24.  Mr. Henon also represented Local 98 at Building Trades meetings and campaigned for Local 98 candidates

at the Building Trades.  N.T. 10/28/21 84:20 – 85:26.  Any restitution amount should be offset by this legitimate work performed by Mr. Henon.

> iii.   The Court Should Decline to Enter a Restitution Order Under § 3663A(a)(1)(B)(ii)(2)

Under section 3663A(a)(1)(B)(ii)(2) the Court is authorized to decline from entering a restitution order if the "complications and prolongation of the sentencing process" resulting from the fashioning of an order "outweighs the need to provide restitution to any victims."   It is difficult to quantify the amount of money that Mr. Henon would be entitled to, or exempt from paying in restitution, based on the nature of the work he did for the union.  It was apparent at trial that a stamped union timecard does not exist.  However, it is evident that he performed work for the union and that the union would be unjustly enriched – not only because it was the primary beneficiary of his actions that underlie his conviction – but because the union paid him for his time on these other matters.  That is precisely why restitution to the union is inappropriate under 18 U.S.C. § 3663A(3)(B).  This Court's determination of the complex issues of fact in order to quantify Mr. Henon's legitimate contributions to the union unnecessarily complicates his sentencing and outweighs the need to provide the union restitution, particularly where the union benefitted from the actions for which he was convicted.

> b.   Forfeiture Should Not Be Imposed

There are two notices of forfeiture as to Mr. Henon in the Indictment: Notice of Forfeiture Four ("Notice Four") and Notice of Forfeiture Five ("Notice Five").  *See* Indictment at 150-151.  Notice Four seeks a forfeiture judgment in the amount of $158,892 on the basis of Counts Ninety-Seven through One Hundred Nine (97-109) and Count One Hundred Thirteen (113). Notice Five seeks a forfeiture judgment in the amount of $13,000 on the basis of Counts One Hundred Ten through One Hundred Twelve and One Hundred Fourteen through One

21

Hundred Sixteen.  Mr. Henon was acquitted of Counts One Hundred Eleven, One Hundred

Twelve, One Hundred Fourteen, and One Hundred Fifteen.  The Government will likely seek a

forfeiture judgment at sentencing of only $5,000 pursuant to Notice Five (the value of check at

issue in Counts 110 & 114).

In both Notices, forfeiture is sought under 28 U.S.C. § 2461(c) and 18 U.S.C. §

981(a)(1)(c).  Section 2461(c) of Title 28 is a procedural rule which provides that in a criminal

case in which a defendant is charged with a crime for which Congress has authorized forfeiture,

the government may include a notice of forfeiture in the Indictment.  Section 981(a)(1)(C) of

Title 18, titled Civil Forfeiture, makes any property involved in a transaction in violation of any

offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7). Section

1956(c)(7)(A) defines "specified unlawful activity" as "any act or activity constituting an offense

listed in [18 U.S.C. § 1961(1)]."  18 U.S.C. § 1961 lists section 1343 (relating to wire fraud).

In sum, Mr. Henon was convicted of offenses subject to the Civil Forfeiture statute

codified at 18 U.S.C. § 981.  On that basis, the government seeks money judgments in the

amount of $158,892 and $13,000, respectively.  The Government's authority for imposition of a

money judgment in this case is based on *United States v. Vampire Nation*, 451 F.3d 189 (3d Cir.

2006).  In *Vampire Nation*, the Third Circuit wrote that Section 2461(c) authorizes criminal

forfeiture where "(1) a substantive provision exists for civil forfeiture of the criminal proceeds at

issue; and (2) there is no specific statutory provision that permits criminal forfeiture of such

proceeds." 451 F.3d at 199 (emphasis added).  Forfeiture in Mr. Henon's case should not be

imposed because *Vampire Nation* was wrongly decided and is inconsistent with the language of

the statute.  Here, section 981 provides for the forfeiture of "[a]ny property, real or personal,

which constitutes or is derived from proceeds traceable to" the enumerated violations.  The

statute by its terms applies to property that can be connected to the proceeds of the violations and does not describe a separate right to a money judgment.  Moreover, the *Vampire Nation* panel relied upon language in § 2461(C) that incorporates the procedural provisions of the Controlled Substances Act, 21 U.S.C. § 853(p), however, section 2461(c) does not provide for a separate money judgment.  The defendant recognized that the Court is bound by Vampire Nation and so seeks only to preserve the issue.

IV.     CONCLUSION

For these reasons, Mr. Henon respectfully requests that the Court exercise its discretion and authority to vary downward and impose a sentence of incarceration well below that called for by the advisory guideline.

Date:  February 23, 2023                                   Respectfully submitted,

*/s/ Brian J. McMonagle*
BRIAN J. MCMONAGLE
MCMONAGLE, PERRI, MCHUGH &
MISCHAK
1845 WALNUT ST 19TH FL
PHILADELPHIA, PA 19103
Tel: 215-981-0999
bmcmonagle@mpmpc.com

*/s/ Catherine M. Recker*
Catherine M. Recker
Richard D. Walk, III
WELSH & RECKER, P.C.
306 Walnut St.
Philadelphia, PA 19106
Tel: (215) 972-6430
cmrecker@welshrecker.com
rwalk@welshrecker.com

*Attorneys for Defendant Robert Henon*

23

<u>CERTIFICATE OF SERVICE</u>

I, Richard D. Walk, III, hereby certify that on this date I delivered by ECF and by email a true and correct copy of the foregoing Sentencing Memorandum of Defendant Robert Henon to the following counsel:

Richard P. Barrett, AUSA
Richard.barrett3@usdoj.gov

Frank R. Costello, AUSA
Frank.costello@usdoj.gov

Bea Witzleben, AUSA
Bea.witzleben@usdoj.gov

Suite 1250
615 Chestnut Street
Philadelphia, PA 19106

Date: February 23, 2022                              /s/ Richard Walk